# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRISHIA MARIE DITTMER,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | Case No.  1:22-cv-01378-SAB<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DIRECTING CLERK OF THE COURT TO ENTER JUDGMENT IN FAVOR OF COMMISSIONER OF SOCIAL SECURITY AND CLOSE THIS MATTER<br><br>(ECF Nos. 19, 22) |

## I.

## INTRODUCTION

Patrishia Marie Dittmer ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff requests the decision of Commissioner be vacated and the case be remanded for further proceedings arguing the Administrative Law Judge's ("the ALJ") opinion is not supported by

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge and this action has been assigned to Magistrate Judge Stanley A. Boone for all purposes.  (See ECF Nos. 9, 12.)

1   substantial evidence and he erred by failing to develop the record.  Additionally, Plaintiff argues the

2   residual functional assessment does not include limitations consistent with her symptoms and the ALJ

3   did not provide any reasons to reject Plaintiff's subjective complaints.

4        For the reasons explained herein, Plaintiff's motion for summary judgment shall be denied.

5                                        **II.**

6                                 **BACKGROUND**

7   **A.      Procedural History**

8        Plaintiff has filed three prior applications for a period of disability and disability insurance

9   benefits and two prior applications for supplemental security income that were all denied at the

10  initial level in 2007, 2010, and 2014, with no appeals filed.  (AR 23.)

11       Plaintiff protectively filed the current application for a period of disability and disability

12  insurance benefits and a Title XVI application for supplemental security income on August 1, 2019.

13  (AR 141, 142.)  Plaintiff's applications were initially denied on February 6, 2020, and denied upon

14  reconsideration on April 23, 2020.  (AR 177-81, 183-88.)  Plaintiff requested and received a hearing

15  before ALJ William R. Stanley.  Plaintiff appeared unrepresented for a telephonic hearing on

16  January 26 and June 29, 2021.  (AR 44-66, 67-107.)  On August 25, 2021, the ALJ issued a decision

17  finding that Plaintiff was not disabled.  (AR 20-38.)  On August 22, 2022, the Appeals Council

18  denied Plaintiff's request for review.  (AR 1-3.)

19  **B.      The ALJ's Findings of Fact and Conclusions of Law**

20       The ALJ made the following findings of fact and conclusions of law as of the date of the

21  decision, August 25, 2021:

22       1.   Plaintiff meets the insured status requirements of the Social Security Act through

23            March 31, 2023.

24       2.   Plaintiff has not engaged in substantial gainful activity since April 1, 2019, the alleged

25            onset date.

26       3.   Plaintiff did receive unemployment compensation in 2019, 2020, and 2021.

27       4.   Plaintiff has the following severe impairments: fibromyalgia; obesity; mild

28            degenerative disc disease of the thoracic spine; degenerative disc disease of the cervical

spine; mild to moderate facet arthropathy of the lumbar spine; seizure disorder; depressive disorder; anxiety disorder; bipolar disorder; and posttraumatic stress disorder ("PTSD").

5. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

6. After careful consideration of the entire record, the ALJ found that Plaintiff has the residual functional capacity to perform light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b) except: requires no more than occasionally climbing ramps/stairs or stooping, crouching, and crawling; requires no climbing ladders, ropes, or scaffolds; is limited to simple, routine and repetitive tasks requiring only simple decisions, with no fast paced production requirements such as assembly line work or piecemeal quotas; is capable of adapting to changes in the work environment, meaning changes in work responsibilities or work place, which are explained in advance of implementation and implemented gradually over time; and involves no more than occasional contact with coworkers, supervisors, and the general public.

7. Plaintiff has no past relevant work.

8. Plaintiff was born on December 7, 1982, and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

9. Plaintiff has a limited education.

10. Transferability of job skills is not an issue because Plaintiff does not have past relevant work.

11. Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform.

12. Plaintiff has not been under a disability, as defined in the Social Security Act, from April 1, 2019, through the date of this decision.

(AR 25-38.)

///

## III.

## LEGAL STANDARD

### A.    The Disability Standard

To qualify for disability insurance benefits under the Social Security Act, a claimant must show she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[2] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Regulations set out a five-step sequential evaluation process to be used in determining if a claimant is disabled.  20 C.F.R. § 404.1520;[3] Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1194 (9th Cir. 2004).  The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

Step one: Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is not disabled.  If not, proceed to step two.

Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work?  If so, proceed to step three.  If not, the claimant is not disabled.

Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1?  If so, the claimant is disabled.  If not, proceed to step four.

Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work?  If so, the claimant is not disabled.  If not, proceed to step five.

Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).  The burden of proof is on the claimant at steps one through four.  Ford v. Saul, 950 F.3d 1141, 1148 (9th Cir. 2020).  A claimant establishes a *prima facie* case of qualifying disability once she has carried the burden of

---

[2] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).

[3] The regulations which apply to disability insurance benefits, 20 C.F.R. §§ 404.1501 et seq., and the regulations which apply to SSI benefits, 20 C.F.R. §§ 416.901 et seq., are generally the same for both types of benefits. Accordingly, to the extent cases cited herein may reference one or both sets of regulations, the Court notes these cases and regulations are applicable to the instant matter.

1   proof from step one through step four.

2       Before making the step four determination, the ALJ first must determine the claimant's

3   RFC. 20 C.F.R. § 416.920(e); Nowden v. Berryhill, No. EDCV 17-00584-JEM, 2018 WL 1155971,

4   at *2 (C.D. Cal. Mar. 2, 2018).  The RFC is "the most [one] can still do despite [her] limitations"

5   and represents an assessment "based on all the relevant evidence."  20 C.F.R. §§ 404.1545(a)(1);

6   416.945(a)(1).  The RFC must consider all of the claimant's impairments, including those that are

7   not severe.   20 C.F.R. §§ 416.920(e); 416.945(a)(2); Social Security Ruling ("SSR") 96-8p,

8   available at 1996 WL 374184 (Jul. 2, 1996).[4]  A determination of RFC is not a medical opinion,

9   but a legal decision that is expressly reserved for the Commissioner.  See 20 C.F.R. §§

10  404.1527(d)(2) (RFC is not a medical opinion); 404.1546(c) (identifying the ALJ as responsible for

11  determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine

12  residual functional capacity."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001).

13      At step five, the burden shifts to the Commissioner, who must then show that there are a

14  significant number of jobs in the national economy that the claimant can perform given her RFC,

15  age, education, and work experience.  20 C.F.R. § 416.912(g); Lounsbury v. Barnhart, 468 F.3d

16  1111, 1114 (9th Cir. 2006).  To do this, the ALJ can use either the Medical Vocational Guidelines

17  ("grids") or rely upon the testimony of a VE.  See 20 C.F.R. § 404 Subpt. P, App. 2; Lounsbury,

18  468 F.3d at 1114; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).  "Throughout the five-

19  step evaluation, the ALJ is responsible for determining credibility, resolving conflicts in medical

20  testimony, and for resolving ambiguities.' "  Ford, 950 F.3d at 1149 (quoting Andrews v. Shalala,

21  53 F.3d 1035, 1039 (9th Cir. 1995)).

22      **B.      Standard of Review**

23      Congress has provided that an individual may obtain judicial review of any final decision

24  of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).  In

25  determining whether to reverse an ALJ's decision, the Court reviews only those issues raised by

---

26

27  [4] SSRs are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner.  20 C.F.R. § 402.35(b)(1).  While SSRs do not have the force of law, the Court gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir.

28  1989); see also Avenetti v. Barnhart, 456 F.3d 1122, 1124 (9th Cir. 2006).

the party challenging the decision. See Lewis v. Apfel, 236 F.3d 503, 517 n.13 (9th Cir. 2001). Further, the Court's review of the Commissioner's decision is a limited one; the Court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); Biestek v. Berryhill, 139 S. Ct. 1148, 1153 (2019). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart (Thomas), 278 F.3d 947, 954 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)); see also Dickinson v. Zurko, 527 U.S. 150, 153 (1999) (comparing the substantial-evidence standard to the deferential clearly erroneous standard). "[T]he threshold for such evidentiary sufficiency is not high." Biestek, 139 S. Ct. at 1154. Rather, "[s]ubstantial evidence means more than a scintilla, but less than a preponderance; it is an extremely deferential standard." Thomas v. CalPortland Co. (CalPortland), 993 F.3d 1204, 1208 (9th Cir. 2021) (internal quotations and citations omitted); see also Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996). Even if the ALJ has erred, the Court may not reverse the ALJ's decision where the error is harmless. Stout, 454 F.3d at 1055–56. Moreover, the burden of showing that an error is not harmless "normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409 (2009).

Finally, "a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). Nor may the Court affirm the ALJ on a ground upon which he did not rely; rather, the Court may review only the reasons stated by the ALJ in his decision. Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007); see also Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003). Nonetheless, it is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's; rather, if the evidence "is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." Ford, 950 F.3d at 1154 (quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)).

///

///

1
2

# IV.

## DISCUSSION AND ANALYSIS

3    Plaintiff contends that the ALJ's RFC determination is not supported by substantial evidence

4  because he failed in his duty to complete the record and obtain an opinion of Plaintiff's RFC from

5  an examining physician.  Further, Plaintiff argues that the ALJ failed to include work related

6  limitations consistent with the nature and intensity of her limitations and failed to offer any reason

7  to reject her subjective complaints.

8    **A.    Whether the ALJ erred in evaluating Plaintiff's subjective complaints**

9    The Court shall first consider Plaintiff's argument that the ALJ erred in evaluating her

10  subjective complaints.  (Mot. 11.)  Plaintiff argues that the ALJ vaguely stated that Plaintiff's

11  statements were not consistent with the medical record and other evidence in the record and then

12  simply summarized the record that detailed Plaintiff's reported symptoms.  (Mot. 11.)  Plaintiff

13  states that the general summary of the evidence offers no findings or conclusions as to what

14  evidence undermines Plaintiff's alleged limitations.  (Mot. 11.)

15    Defendant counters that the ALJ did not flatly reject Plaintiff's subjective complaints, but

16  specified the exertional and nonexertional functional limitations that were supported by the record.

17  (Opp. 9.)  Defendant argues that the objective evidence was one of the factors the ALJ considered.

18  The ALJ also considered that Plaintiff had two hospitalizations since the alleged onset date.

19  Defendant contends that ALJ noted that both hospitalizations involved an increase in alcohol use,

20  and she improved quickly after detoxification from alcohol and mental health treatment.  (Opp. 10.)

21  Defendant asserts that the ALJ also considered Plaintiff's daily activities, and that the consultative

22  examiner reported a diagnosis of malingering of psychiatric and cognitive disorder.  (Opp. 10-11.)

23    1.    Relevant Symptom Testimony

24    Plaintiff first appeared for a telephonic hearing on January 26, 2021, and during questioning

25  on whether she had any objections to the evidence in the record, Plaintiff stated her seizures and

26  her mental state was not stable; she repeatedly asserted that her mental state was not stable, and she

27  was not able to work.  (AR 76-7.)  Plaintiff stated she had objections as to why she had been denied

28  benefits, but no objections to the records that had been submitted.  (AR 79.)

Plaintiff testified that her ex-husband filed for custody of her 12-year-old twins several years ago because her mental and physical health was not very good, she kept going into a mental health hospital, and she could not take care of herself.  (AR 83.)  She lost custody and can see them every other weekend.  (AR 83-4.)  She does not have a driver's license because of her epilepsy.  (AR 84.)

Plaintiff was in special education classes and completed the twelfth grade but did not graduate from high school because she was unable to pass the proficiency testing.  (AR 84, 85.) She tried to get her GED but was unable to pass the testing.  (AR 84.)

Prior to April 1, 2019, Plaintiff was working parttime, two hours per day, taking care of her mother.  (AR 86, 87.)  Plaintiff was unable to continue caring for her mother because she could not physically walk over there, and her sister took over.  (AR 86.)  Plaintiff had trouble walking down the steps and fell and broke her ribs.  (AR 86-7.)

Plaintiff does not remember what work she was doing in 2014 and 2015.  (AR 88.)  In 2006, Plaintiff worked for Vons Grocery Stores.  (AR 88.)  She thinks she worked at the service deli.  (AR 89.)  It was her favorite place to work, but she does not remember what she did.  (AR 89.)  Plaintiff's ex-husband helped her fill out her application and she does not remember her work history.  (AR 90.)

Plaintiff is unable to work because of her memory, depression, bipolar disorder, and she has bad arthritis in her back and hands.  (AR 90.)   She has osteoarthritis in her neck, cannot turn her head to the right, and cannot bend it backwards.  (AR 90.)  Plaintiff is receiving injections in her back and, after the Coronavirus clears up, she will receive surgery for her back and neck.  (AR 90.) She is scheduled to have surgery for her stomach because her bladder is falling out and she has cancer.  (AR 90.)  She has spinal stenosis and fibromyalgia and cannot do anything by herself.  (AR 91.)

Plaintiff goes to a behavioral health clinic and sees a therapist.  (AR 91.)  She has schizophrenia and has been hospitalized several times as 5150.[5]  (AR 91.)  Plaintiff is receiving

---

[5] Under section 5150 of the California Welfare and Institutions Code, a per who is danger to themselves or others or is gravely disabled, due to a mental health disorder can be taken into custody for up to 72 hours for assessment, evaluation, and crisis intervention.  Cal. Welf. & Inst. Code § 5150(a).

treatment at the Exit Clinic, Kaweah Delta, and has been seen at Adventist Health Center and Delta Health Center.  (AR 92-6.)  Plaintiff was afraid that a lot of people were talking to her that morning.  (AR 97.)  She was shaking badly and did not sleep the prior night.  (AR 97.)  Plaintiff had a hysterectomy a year and a half ago.  (AR 95.)  She has a neurologist who treats her epilepsy.  (AR 96.)  Plaintiff was seen by a gastroenterologist at Adventist Health Center who diagnosed her with GERD.  (AR 96.)   Plaintiff has had additional testing done since her records were submitted.  (AR 97.)  She learned she has osteoporosis and bone cancer and her bones have been broken fifteen times in the last three months.  (AR 98.)  She always requires someone to be with her.  (AR 98.)

The ALJ addressed whether there was a typographical error in the record which states that Plaintiff was male.  (AR 98-9.)  Plaintiff clarified that she is female and stated that she gets angry and wanted to break her window.  (AR 99-100.)  Plaintiff stated she has been disabled and has been on medication for her mental disability her whole life.  (AR 100.)  Physically and mentally she just cannot do it anymore.  (AR 100-01.)

The ALJ determined that further development of the record would be appropriate.  He would obtain more records and try to get a consultative examination for Plaintiff.  (AR 101.)

During questioning of the vocational expert, Plaintiff stated mentally or physically she cannot do anything now or long term.  (AR 106.)  Even her doctors state that she cannot do anything, and they are willing to testify or write a letter.  (AR 106.)

Plaintiff testified at a continued telephonic hearing on June 29, 2021.  (AR 46, 51-59. 65.)  A psychological consultative examination had been conducted and records from Fremont Hospital had been obtained to further develop the record.  (AR 46.)  Plaintiff confirmed that she had waived representation and wished to continue with the hearing unrepresented.  (AR 49.)

Plaintiff was still living in a motor home with her boyfriend and her helper lived up front.  (AR 51-2.)  Her helper helps her clean her house, do dishes, walk up steps, get dressed, gets her mail, and does everything in her house because she cannot do it.  (AR 52.)  There are steps going up to Plaintiff's mobile home and she has fallen off them many times because there is no rail.  (AR 52.)

Plaintiff lost custody of her children five years ago and, due to her mental health, she is only

able to see them on supervised visits every two weeks.  (AR 53.)  The prior week, she lost custody because they said her mental state was not stable enough for her to be alone with the children after she went into a mental hospital in March.  (AR 53.)  She was in Fremont hospital for eight days. (AR 54.)  Plaintiff lost her driver's license in 2014 because of her seizures and due to a DUI in 2016.  (AR 54.)

Plaintiff has not looked for work because both her physical and mental health providers have told her she cannot work, and they will not allow her to do so.  (AR 56.)  Plaintiff is unable to work because she cannot do anything due to her back, neck, and knees.  (AR 56.)  She can barely walk without her back seizing up on her and it starts hurting so bad she must find a chair to sit down. (AR 56.)  Her neck hurts every day.  (AR 57.)  She is going to physical therapy to train her to hold her head up, so it does not lean to the right.  (AR 57.)  She just had an MRI that showed her neck is fused together.  (AR 57.)  They are going to do surgery to put stents in her neck so she can keep her head up and forward and stimulators in her back to help the pain.  (AR 57.)  The disks in her back are rubbing together and they are going to put fake disks in her back to relieve her pain.  (AR 57.) She has bad osteoarthritis in her back, arthritis in her hands, fibromyalgia, degenerative disks, and bone disease.  (AR 57.)  Every time she bumps a bone it breaks and, four weeks ago, she broke her foot from just dropping a water hose on it, shattering the number 2 and number 3 bones. (AR 57-8.)  Plaintiff got a sore on her hand from coloring in a coloring book, so she is undergoing therapy on her hand and must have an MRI and have her right arm fixed.  (AR 58.)  Plaintiff's knees are so bad she can barely get up and down off the couch.  (AR 58.)

They are unable to control Plaintiff's anxiety with Ativan, so they added valium which is working a lot better.  They have added morphine for her pain, mixed with the Norco, it is working a lot better to control her pain.  (AR 59.)

Plaintiff also submitted an adult function report on December 17, 2019, stating that her conditions affect lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, stair-climbing, seeing, memory, completing tasks, concentration, using hands, and getting along with others.  (AR 348.)  On March 15, 2020, Plaintiff submitted an adult function report stating her conditions also affect hearing, understanding, and following instructions.  (AR 384.)  She submitted

a pain questionnaire on March 15, 2020, stating she was able to walk or stand a few minutes and sit for five minutes.  (AR 374.)  She also submitted a seizure questionnaire on March 15, 2020, stating her seizures occur monthly.  (AR 389.)

      2.    <u>Legal Standard</u>

A claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability.  42 U.S.C. § 423(d)(5)(A); SSR 16-3p; <u>see also</u> <u>Orn</u>, 495 F.3d at 635 ("An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment.").  Rather, an ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  <u>See</u> <u>Garrison v. Colvin</u>, 759 F.3d 995, 1014 (9th Cir. 2014); <u>Smolen</u>, 80 F.3d at 1281; SSR 16-3p, at *3.  First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged.  <u>Garrison</u>, 759 F.3d at 1014; <u>Smolen</u>, 80 F.3d at 1281–82.  If the claimant satisfies the first step and there is no evidence of malingering, "the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so."  <u>Lambert v. Saul</u>, 980 F.3d 1266, 1277 (9th Cir. 2020) (citations omitted).

If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive.  The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints.  In this regard, questions of credibility and resolutions of conflicts in the testimony are functions solely of the Secretary.  <u>Valentine v. Astrue</u>, 574 F.3d 685, 693 (9th Cir. 2009) (quotation omitted); <u>see also</u> <u>Lambert</u>, 980 F.3d at 1277.

In addition to the medical evidence, factors an ALJ may consider include the location, duration, and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; conflicts between the claimant's testimony and the claimant's conduct—such as daily activities, work record, or an unexplained failure to pursue or follow treatment—as well as ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, internal

contradictions in the claimant's statements and testimony, and other testimony by the claimant that appears less than candid.  See Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014); Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008); Lingenfelter v. Astrue, 504 F.3d 1028, 1040 (9th Cir. 2007); Smolen, 80 F.3d at 1284.  Thus, the ALJ must examine the record as a whole, including objective medical evidence; the claimant's representations of the intensity, persistence and limiting effects of her symptoms; statements and other information from medical providers and other third parties; and any other relevant evidence included in the individual's administrative record.  SSR 16-3p, at *5.

### 3.   Discussion

The ALJ discussed Plaintiff's symptom testimony.

The claimant alleged disability based on epilepsy, multiple sclerosis, fibromyalgia, arthritis in the hands and back, broken foot, metal in leg from broken leg, anxiety disorder, type I bipolar, manic depression, schizophrenia, degenerative disc and bone disease, spinal stenosis, PTSD, dissociative disease, gastroesophageal reflux disease, gastritis, memory loss, stents, Crohn's disease, acid reflux, endometriosis, bladder problems, and chronic pain syndrome (Exhibit 3E).  She reported she is unable to write, lift, stand, sit, or lie down for long periods (Exhibits 6E and 11E).  She reported she has seizures monthly despite being prescribed seizure medication (Exhibit 12E).  She reported she has arthritis and is always in pain.  She reported she is dizzy and she falls (Exhibit 11E).  She reported she is severely depressed and has memory problems.  She reported her impairments cause difficulty in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, seeing, stair climbing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others (Exhibits 6E/6 and 11E/10).  She reported she uses a cane (Exhibits 6E/7 and 11E/11).

During the phone hearing, the claimant testified that she is unable to work due to her back, neck, and knees.  She reported she could barely walk without her back giving out.  She reported she has daily severe neck pain.  She reported she is in physical therapy and she is going to get a stimulator in her back.  She reported she has fibromyalgia, degenerative disc disease, and arthritis through her hands and back.  She testified that she broke her foot four weeks ago.  As to her mental impairments, she testified that she is prescribed morphine and valium.  She testified her anxiety cannot be controlled with Ativan and the morphine mixed with Norco helps.

After careful consideration of the evidence, the undersigned has found that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

One factor considered in evaluating the intensity, persistence, or limiting effects of the claimant's symptoms is activities of daily living (Social Security Ruling 16-3p; 20 CFR 404.1529(c)(3) and 416.929(c)(3)).  The claimant testified that she lives with her

boyfriend and has a helper that cleans the house.  On forms submitted to the District Office, she reported she is able to attend to her own personal care with some help, help care for animals, shop in stores and by phone, pay bills, and handle her finances (Exhibits 6E and 11E).  She reported she does not drive, prepare meals, or do any household chores except she tries to vacuum.  The claimant's daughter reported she does the entire claimant's housework and prepares all meals (Exhibits 5E and 12E).  Even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the objective medical evidence discussed in this decision.

(AR 31-32.)

The ALJ then addressed the medical evidence and found,

Based on the medical evidence of record discussed above, the undersigned has found that the claimant's allegations as to the intensity and limiting effects of her physical impairments are not fully consistent with the medical evidence of record and do not preclude the claimant from performing the limited range of work activity prescribed in the residual functional capacity. While the claimant has seizures, EEG and CT of head were normal, the medical evidence does not support the frequency of seizures she has alleged, and treatment notes support they are relatively controlled with medication. Also, she has not had any emergency room visits or hospitalizations for seizures since 2017. While she has some abnormal findings of imaging of her cervical, thoracic, and lumbar spines, her treatment has been limited and conservative and she has reported improvement in pain with treatment. Although, she has been diagnosed with fibromyalgia, she has not had any treatment with a specialist and no examination has noted any tender points. Also despite her spinal impairments, morbid obesity, fibromyalgia, and reports of pain, examinations in 2019 and 2020 showed essentially normal gait, normal strength, and no indication of any consistent sensation deficits (Exhibits 3F/1, 3, 5, 7; 5F/175, 192, 198, 209; 6F/18, 25; 9F/12, 23, 28, 62, 97, 134, 140).

(AR 33.)

### a.    Allegations Unsupported/Contradicted by the Objective Medical Evidence

Subjective pain testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence."  See Vertigan, 260 F.3d at 1049 ("The fact that a claimant's testimony is not fully corroborated by the objective medical findings, in and of itself, is not a clear and convincing reason for rejecting it.");  see also 20 C.F.R. § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.").  Rather, where a claimant's symptom testimony is not fully substantiated by the objective medical record, the ALJ must provide an additional reason for discounting the testimony.  See Burch, 400 F.3d at 680–81.

Nevertheless, the medical evidence "is still a relevant factor in determining the severity of

1   [the] claimant's pain and its disabling effects."  <u>Burch</u>, 400 F.3d at 680–81; <u>Rollins v. Massanari</u>,

2   261 F.3d 853, 857 (9th Cir. 2001); SSR 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).  Furthermore,

3   Ninth Circuit caselaw has distinguished testimony that is "uncorroborated" by the medical evidence

4   from testimony that is "contradicted" by the medical records, deeming the latter sufficient on its

5   own to meet the clear and convincing standard.  <u>See</u> <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1434 (9th

6   Cir. 1995) ("The ALJ … identified several contradictions between claimant's testimony and the

7   relevant medical evidence and cited several instances of contradictions within the claimant's own

8   testimony.  We will not reverse credibility determinations of an ALJ based on contradictory or

9   ambiguous evidence."); <u>Hairston v. Saul</u>, 827 Fed. App'x 772, 773 (9th Cir. 2020) (quoting

10  <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1160 (9th Cir. 2008) (affirming ALJ's

11  determination claimant's testimony was "not entirely credible" based on contradictions with

12  medical opinion)) ("[c]ontradiction with the medical record is a sufficient basis for rejecting the

13  claimant's subjective testimony."); <u>see also</u> <u>Stobie v. Berryhill</u>, 690 Fed. App'x 910, 911 (9th Cir.

14  2017) (finding ALJ gave two specific and legitimate clear and convincing reasons for rejecting

15  symptom testimony: (1) insufficient objective medical evidence to establish disability during the

16  insured period and (2) symptom testimony conflicted with the objective medical evidence; <u>Woods</u>

17  <u>v. Comm'r of Soc. Sec.</u>, No. 1:20-cv-01110-SAB, 2022 WL 1524772, at *10 n.4 (E.D. Cal. May

18  13, 2022) ("While a *lack* of objective medical evidence may not be the sole basis for rejection of

19  symptom testimony, inconsistency with the medical evidence or medical opinions can be

20  sufficient." (emphasis in original)).  In applying the clear and convincing standard, the Ninth Circuit

21  affirmed "[c]ontradiction with the medical record is a sufficient basis for rejecting the claimant's

22  subjective testimony."  <u>Carmickle</u>, at 533 F.3d at 1161.

23          i.    <u>Plaintiff's testimony regarding her symptoms is contradicted in the medical record</u>

24          Here, the ALJ found that Plaintiff's allegations of the frequency of her seizures were

25  contradicted by the medical records.  Specifically, while Plaintiff alleged that she had seizures

26  monthly despite being prescribed medication (AR 31, 389), the ALJ correctly found that the

27  medical evidence does not support the frequency of seizures she has alleged.  (AR 33.)  The medical

28  record shows that Plaintiff has a history of seizure activity beginning in 2017.  On May 25, 2017,

1   Plaintiff was admitted complaining of a seizure episode.  (AR 1285.)  Her boyfriend reported she

2   had one seizure episode the prior year.  (AR 33, 1288.)    A computed tomography of the head

3   showed no intracranial pathology, and an EEG was unremarkable.  (AR 33, 1285, 1316.)  Plaintiff

4   had been prescribed Lyrica but ran out of it and was not taking the medication.  (AR 33, 1300.)  It

5   was suggested that Plaintiff's medication was causing a lower seizure threshold.  (AR 1285, 1300.)

6          Plaintiff saw a neurologist regarding the seizure activity on August 8, 2017, and was

7   diagnosed with atypical syncope.  (AR 33, 1450-53.)  On September 26, 2017, Plaintiff was seen

8   in the emergency room for a possible seizure but was not hospitalized.  (AR 33, 1219.)  She reported

9   she had seizure activity every three months with the last episode being in May 2017.  (AR 1219.)

10          The ALJ noted a gap in treatment.  (AR 33.)  Plaintiff did not see a neurologist again until

11   July 31, 2018.  (AR 33, 1445.)  She reported that she was taking Keppra and had not had any

12   seizures since the two the prior year.  (AR 33, 1445.)  Plaintiff was seen on October 30, 2018, and

13   reported having a seizure on October 3, 2018.  (AR 33, 1440.)  A November 17, 2018, record notes

14   that she is stable from her seizures.  (AR 1435.)   Plaintiff had routine follow up on January 29,

15   2019, and did not report having more seizures.  (AR 33, 1430.)  The ALJ's finding that Plaintiff

16   misrepresented the frequency of her seizures has substantial support in the medical record.

17          In March 2021, the claimant reported her last seizure was in January 2021.  (AR 33, 1701.)

18   Additionally, the ALJ found the record showed she has not had any emergency room visits or

19   hospitalizations for seizures since 2017.  (AR 33.)

20          Further, Plaintiff testified that she needed a cane to ambulate (AR 349, 385), but the ALJ

21   noted that there is no consistent use of a cane at medical examinations nor any documented medical

22   need for a cane.  (AR 34.)  Review of the record supports the ALJ's finding that Plaintiff's testimony

23   regarding the use of a cane is contradicted by the medical record.  Specifically, there is no evidence

24   in the record that Plaintiff consistently if ever used a cane during her medical appointments.  To the

25   contrary, the record consistently records that she ambulates freely and has no gait abnormalities.

26   (AR  761, 763, 767, 1386, 1391, 1392, 1422, 1484, 1499, 1500, 1533, 1569.)

27          The medical evidence contradicting Plaintiff's testimony regarding the frequency of her

28   seizures and her need for a cane to ambulate are clear and convincing reasons for the ALJ to reject

1    her symptom testimony.  Stobie, 690 Fed. App'x at 911; Woods, No. 1:20-cv-01110-SAB, 2022

2    WL 1524772, at *10 n.4; Carmickle, at 533 F.3d at 1161.

3          ii.    Plaintiff's symptom complaints are not corroborated in the medical record

4          Additionally, the ALJ found that Plaintiff's testimony regarding the severity of her physical

5    symptoms was inconsistent with the medical evidence.  As the ALJ noted, Plaintiff testified she is

6    unable to work due to her back, neck, and knees.  (AR 31.)  She stated that she is always in pain

7    and can barely walk without her back giving out and has severe neck pain daily.  (AR 31.)  Plaintiff

8    testified that she is unable to write, lift, stand, sit, or lie down for longs periods.  (AR 31.)  Her

9    impairments cause difficulty in lifting, squatting, bending, standing, reaching, walking, sitting,

10   kneeling, talking, seeing, stair climbing, memory, completing tasks, concentration, understanding,

11   using her hands, and getting along with others.  (AR 31.)  She reports using a cane.  (AR 31.)  The

12   ALJ noted that despite her spinal impairments, morbid obesity, fibromyalgia, and reports of pain,

13   examinations in 2019 and 2020 showed essentially normal gait, normal strength, and no indication

14   of any consistent sensation deficits.  (AR 33.)  The ALJ considered the following records.

15         Plaintiff was seen on June 13, 2019, complaining of swelling all over her body.  (AR 1611.)

16   The record notes that she has been missing her medication doses several times a week with two

17   seizures in the prior six months.  (AR 1611.)

18         On June 14, 2019, Plaintiff was seen for a follow-up and complained of swelling in both

19   lower extremities and right ankle pain.  (AR 1605.)  She reported the swelling started with her

20   medication and the right ankle pain started two to three weeks prior and she had no trauma, accident,

21   or falls.  (AR 1605.)  On examination, she was noted to be awake, alert, oriented, and in no acute

22   distress.  (AR 1606.)  Extremity examination notes she walks freely with full range of motion.  (AR

23   1606.)  There is trace edema and the right ankle shows a scar from a previous surgery.  (AR 1606.)

24   There is tenderness at the second and third metatarsal, and Plaintiff has a minimal limp when she

25   walks.  (AR 1606.)

26         Plaintiff was seen on July 10, 2019, for a possible right foot fracture and x-ray results.  (AR

27   1559.)  The x-ray of the right foot showed a healing fracture midshaft second metatarsal.  (AR

28   1569.)  The record notes what is seen appears intact and unremarkable.  (AR 1569.)  No definite

acute fracture is seen.  (AR 1569.)  On examination, Plaintiff was awake, alert, oriented, and in no acute distress.  (AR 1569.)  Examination of the extremities notes that Plaintiff walks freely with full range of motion.  (AR 1569.)  Her right foot shows swelling and tenderness at the second metatarsal bone region and she was walking with a mild limp.  (AR 1569.)

On September 16, 2019, Plaintiff reported that her lower back pain, lower extremity, pain, neck pain, and shoulder pain had been increasing.  (AR 767.)  Examination notes state she was alert, awake, and oriented x3.  (AR 767.)  She did not display any pain behavior throughout the examination.  (AR 767.)  She was in no acute distress and answered questions appropriately.  (AR 767.)  Musculoskeletal exam shows positive tenderness overlying the lumbar paravertebral muscles, and negative tenderness overlying the posterior superior iliac spine.  (AR 767.)  She had a positive straight leg raising on the right.  (AR 767.)  Range of motion of the lumbar spine: flexion 50 degrees/extension 10 degrees, with positive tenderness overlying the lumbar facets.  (AR 767.)  Neuro was intact to light touch and pinprick bilateral to the lower extremity; DTRs were bilateral and symmetrical; and Hoffman sign was negative.  (AR 767.)  Plaintiff's gait was not antalgic, and she did not use an assistive device.  (AR 767.)  Exam of the extremities revealed no edema, no cyanosis, and intact peripheral pulses.  (AR 767.)

Plaintiff was seen on October 4, 2019, complaining of chronic lower back pain.  (AR 1533.)  The record reports she had an MRI in May 2019 which was unremarkable.  (AR 1533.)  She reported tingling and numbness in her feet, but no difficulty walking.  (AR 1533.)  On examination, Plaintiff was noted to be alert, oriented, in no acute distress, and walked and talked freely.  (AR 1534.)  Her neck was supple and nontender.  (AR 1534.)  Musculoskeletal examination revealed normal range of motion and strength with no tenderness or swelling.  (AR 1534.)  Examination of the back notes no skin changes, no tenderness along the spine, mild tenderness on both paraspinal muscles, instance sensation and pulsation, 2/4 DTR, 5/5 muscle power, full range of motion, and negative LRTs.  (AR 1534.)

Plaintiff presented on October 9, 2019, complaining of abdominal pain that was radiating to her lower right back and bilateral leg pain, and chest pain for a week that was getting worse.  (AR 1391.)  She was ambulating without assistance.  (AR 1391.)  Examination notes Plaintiff is awake,

alert, cooperative, with a normal mood and affect.  (AR 1392.)  She is oriented x4 with a normal gait.  (AR 1392.)  She was advised to go to urgent care.

On October 17, 2019, Plaintiff received a lumber epidural and lumber facet joint steroid injection.  (AR 765.)

Plaintiff was seen on November 4, 2019, for a further evaluation and reported drinking a small amount of antifreeze in a suicide attempt ten days prior.  (AR 1385.)  Examination of the extremities notes she walks freely and has full range of motion.  (AR 1386.)

Plaintiff was seen on November 12, 2019, reporting she fell in the shower and her neck and back pain were increasing.  (AR 763.)  She complained of low back pain that was radiating to her lower extremities.  (AR 763.)  She reported that the injection gave her 30 to 40 percent relief but only worked for a week and a half and then her pain increased.  (AR 763.)  She requested stronger medication for her back and neck.  (AR 763.)  Plaintiff was seen again on December 3, 2019.  (AR 761, 763.)  Examination notes for both visits record she was alert, awake, and oriented x3.  (AR 761, 763.)  She did not display any pain behavior throughout the examination.  (AR 761, 763.)  She was in no acute distress and answered questions appropriately.  (AR 761, 763.)  Musculoskeletal exam shows positive tenderness overlying the lumbar paravertebral muscles, and negative tenderness overlying the posterior superior iliac spine.  (AR 761, 763.)  She had a positive straight leg raising on the right.  (AR 761, 763.)  Range of motion of the lumbar spine: flexion 50 degrees/extension 10 degrees, with positive tenderness overlying the lumbar facets.  (AR 761, 763.)  Neuro was intact to light touch and pinprick bilateral to the lower extremity; DTRs were bilateral and symmetrical; and Hoffman sign was negative.  (AR 761, 763.)  Plaintiff's gait was not antalgic, and she did not use an assistive device.  (AR 761, 763.)  Exam of the extremities revealed no edema, no cyanosis, and intact peripheral pulses.  (AR 761, 763.)

On November 19, 2019, Plaintiff presented for a neurosurgery consultation complaining of neck pain and arm weakness.  (AR 1369.)  She reported she had a work accident in 2005 with a 150-pound box falling on her neck and then a motor vehicle accident in 2015, both of which have contributed to worsening neck pain.  (AR 1369.)  She stated it has progressed to bilateral upper extremity weakness. (AR 1369.)  She complained of difficulty with fine motor in the bilateral upper

extremities.  She reported that the pain in her neck radiates down her back and that is the pain that is in her lower back which she feels is mostly coming from her neck.  (AR 1369.)  On exam, Plaintiff was alert, awake, and speech was fluent.  (AR 1369.)  Strength in the bilateral upper extremities was 5/5 proximally and 4+/5 distally.  (AR 1369.)  Plaintiff had a positive Hoffman's test.  (AR 1369.)  Strength in the bilateral lower extremities was 5/5.  (AR 1369.)  She was ambulatory.  (AR 1369.)  The record reports a May 11, 2019, MRI of the lower spine revealed a normal exam without a canal or NF stenosis.  (AR 1369.)

Plaintiff was seen on December 4, 2019, complaining of more depression and seeking a change in her medication.  (AR 1425.)  On exam she was alert and oriented.  (AR 1428.)  Speech and language were intact.  (AR 1428.)  She had normal tone in the upper and lower extremities, and sensation was intact.  (AR 1429.)  Reflexes were normal, coordination and gait were normal, and her mood and affect were appropriate.  (AR 1429.)

On December 27, 2019, Plaintiff presented to the gastroenterology office complaining of heartburn.  (AR 1422.)   Examination notes that she is in no acute distress.  (AR 1422.)  Her neck is supple and nontender.  (AR 1422.)  Musculoskeletal exam shows no joint deformity, erythema, or tenderness.  (AR 1422.)  She has full range of motion in all joints and a normal gait.  (AR 1422.)  She had a normal motor, sensory, and mental status examination with reflexes at 2+ throughout.  (AR 1422.)

On January 15, 2020, Plaintiff was seen for a follow up and complained of back pain after falling down the stairs the prior evening.  (AR 1499.)  She reported that she missed a step and fell into a seated position and slid down approximately five steps.  (AR 1499.)  She has been ambulating with no complications, denied any other symptoms and reported doing well otherwise.  (AR 1499.)  She reported the pain was exacerbated with direct pressure on her tailbone, but she had not taken anything to relieve her symptoms.  (AR 1499.)  An x-ray showed no fracture or dislocation.  (AR 1499.)  She had seen the neurosurgeon the prior week about her neck, and he did not recommend surgery.  (AR 1499.)  On examination, Plaintiff was alert, oriented, in no acute distress, and walked and talked freely.  (AR 1500.)  Her neck was supple, with mild tenderness on her c-spine.  (AR 1500.)  Musculoskeletal examination showed normal range of motion and strength, with no

1  tenderness or swelling.  (AR 1500.)  Examination of her back noted no skin changes, no tenderness

2  along the spine, mild tenderness on both paraspinal muscles.  (AR 1500.)  Sensation and pulsation

3  were intact, 2/4 DTR, 5/5 muscle power, full range of motion, and negative LRTs. (AR 1500.)

4      Plaintiff was seen for a preop clearance on February 23, 2020, and it was noted she had a

5  contusion on her face and was at risk for domestic violence.  (AR 1494.)  There was an at length

6  discussion about domestic violence.  (AR 1494.)  She reported her husband hit her on the back

7  while drunk 7 to 10 days ago and choked her again a few days ago as well.  (AR 1494.)  Plaintiff

8  refuses to call the police department stating, "he just got a new job and I don't think he will do it

9  again.  If it happens one more time I will call police."  (AR 1494.)  She reported pain and bruises

10 on her face and lower back, but no other complaints.  (AR 1494.)  Plaintiff requested disability

11 paperwork be filed out stating her lower back pain and psychological conditions cause difficulty in

12 getting a job and her lower back pain was also causing restrictions on activities of daily living.  (AR

13 1494.)  Examination of the neck revealed no skin changes, no tenderness along the spine. mild

14 tenderness on both paraspinal muscles, intact sensation and pulsation, 2/4 DTR, and 5/5 muscle

15 power.  (AR 1495.)

16     Plaintiff was seen on March 16, 2020, to get results of her EEG which was within normal

17 limits.  (AR 1483.)  She reported one episode of loss of consciousness since her prior visit.  (AR

18 1483.)  She also reported no seizure episodes since she had started anti-seizure medication.  (AR

19 1483.)  On exam, Plaintiff is noted to be awake, alert, oriented, and in no acute distress.  (AR 1484.)

20 Examination of the extremities notes that she walks freely and has full range of motion.  (AR 1484.)

21     Plaintiff argues that the record indicates greater pain and limitations than included in the

22 RFC, but here the ALJ reasonably found that Plaintiff's subjective complaints regarding her

23 limitations due to her back and neck pain were inconsistent with the objective findings in the

24 medical record.  The ALJ noted that Plaintiff had some abnormal findings of imaging of her

25 cervical, thoracic, and lumbar spines.  (AR 33.)  Substantial evidence supports the ALJ's finding

26 that despite her spinal impairments, morbid obesity, fibromyalgia and reports of pain, the

27 examinations from 2019 and 2020 show essentially normal gait, normal strength and no indication

28 of any consistent sensory deficits.  (AR 761, 763, 767, 1386, 1391, 1392, 1422, 1484, 1499, 1500,

1533, 1569.)  Further, on visits to the pain specialist referenced by the ALJ, it is noted that Plaintiff does not exhibit any pain behavior during examination.  (AR 761, 763, 767.)  Substantial evidence in the record supports the ALJ's findings that Plaintiff's symptom testimony is inconsistent with the objective findings in the medical record.  See Regennitter v. Commissioner of Social Sec. Admin., 166 F.3d 1294, 1297 9th Cir. 1999) (The determination that a claimant's complaints are inconsistent with clinical evaluations can satisfy the requirement of stating a clear and convincing reason for discrediting the claimant's testimony.)

Additionally, the ALJ noted that Plaintiff saw her psychiatrist on November 1, 2019, and reported feeling "really depressed."  (AR 34, 969.)   Her mental status evaluation was unchanged and showed fair mood, full affect, normal behavior, normal speech, logical and goal directed thoughts processes, normal thought content, adequate memory, intact concentration and attention. (AR 34-5, 970.)  She was alert and oriented x4, good insight and judgment, and adequate fund of knowledge and she was referred for therapy.[6]  (AR 35, 970.)

But the ALJ also considered that three days later, on November 4, 2019, Plaintiff reported to her primary care physician that she made a suicide attempt by drinking antifreeze ten days prior, however she did not report this when she saw her psychiatrist on November 1, 2019.  (AR 35, 1385.)  She reported she was not suicidal, and she did not seek any additional treatment.  (AR 35, 1385.)  See Robbins, 466 F.3d at 884 (conflicting or inconsistent statements can contribute to an adverse credibility finding); Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997), as amended on reh'g (Sept. 17, 1997) (credibility determination can be based on conflicts between the claimant's testimony and his own conduct, or on internal contradictions in that testimony).

Finally, the ALJ noted that Plaintiff attended a consultative examination via telehealth with Mary K. McDonald, Ph.D. on February 23, 2021, and it was noted that she was evasive and refused to cooperate with memory testing.  (AR 35, 1680-86.)  Dr. McDonald diagnosed malingering of psychiatric and cognitive disorder, possibly also of medical disorder, and reported no impairments in functioning.  (AR 35, 1685-84.)  See Mohammad v. Colvin, 595 F. App'x 696, 697 (9th Cir.

---

[6] The ALJ also references a December 2019 visit with her psychiatrist, but this appears to be an error as the record noted is a duplicate of the November 4, 2019, visit.

2014) (evidence of malingering is sufficient to support a negative credibility finding); c.f. Hunter v. Astrue, 874 F. Supp. 2d 902, 914 (C.D. Cal. 2012) (ALJ erred by suggesting malingering where physician noted on multiple occasions during the consultative examination that the claimant appeared to be putting forth his best effort.)

The ALJ provided clear and convincing reasons to find that Plaintiff's symptoms are not as severe as she alleges.  Plaintiff's request for summary judgment on the ALJ's rejection of her subjective complaints is denied.

### B.      Whether the ALJ's determination of Plaintiff's RFC is supported by substantial evidence

Plaintiff argues that the ALJ did not have the opinion of any examining physician after she underwent hospitalization for suicidal ideations and hallucinations, and the ALJ improperly determined that Plaintiff was more limited than the non-examining state agency medical consultants had when they reviewed records that did not include her hospitalizations.  (Mot. 9.)  Plaintiff also argues that the ALJ considered the opinion of Dr. McDonald who failed to find any limitations because she erroneously found Plaintiff only carried a diagnosis of malingering.  (Mot. 9.)  Plaintiff asserts that Dr. McDonald's opinion does not truly address her mental limitations and does not truly opine her ability to function.  (Mot. 10.)  Plaintiff contends that the ALJ only considered opinion evidence that did not consider the full record or address Plaintiff's condition.  (Mot. 10.)  Plaintiff argues that the ALJ had a duty to develop the record and obtain an updated medical opinion and to obtain missing medical records.  (Mot. 10.)  Plaintiff contends that the ALJ wholly ignored numerous comments in the record that indicate Plaintiff continued to treat with her providers after March 2020.  (Mot. 10.)  Plaintiff states that the error is harmful because Plaintiff required additional treatment and hospitalization for her mental conditions and the record does not accurately reflect the current status of her ability to function with her conditions.[7]  (Mot. 11.)

Defendant responds that the record was more than adequately developed and was sufficient for the ALJ to make an informed decision that is supported by substantial evidence.  (Opp. 7.)

---

[7] Plaintiff has not challenged the ALJ's physical residual capacity findings and has therefore waived the issue. Ghanim v. Colvin, 763 F.3d 1154, 1165 (9th Cir. 2014).

Defendant argues that two state agency medical consultants reviewed the evidence of record at the initial level and two additional state agency medical consultants reviewed the record on reconsideration.  (Opp. 7.)   Further the ALJ obtained the February 23, 2023, consultative examination by Dr. McDonald.  (Opp. 7.)  The ALJ held an administrative hearing on June 29, 2023, and the medical record in this instance contains over 1,500 pages.  (Opp. 7.)  Additionally, Plaintiff's attorney did not submit any additional evidence to the appeals counsel.  (Opp. 7.)  Defendant argues that the ALJ considered the evidence and testimony before him, including the medical opinion evidence and prior administrative medical findings.  (Opp. 8.)

Defendant argues that ALJ did not interpret raw medical data but noted that the records characterized Plaintiff's 2019 MRI as unremarkable, and cited pages in the record that referred to MRIs being unremarkable and normal.  (Mot. 8.)  Further, the ALJ noted the physician records that indicated Plaintiff should avoid heavy lifting and carrying.  (Mot. 8.)  Based on the evidence and testimony before him, Defendant argues the ALJ found that Plaintiff's physical and mental impairments restricted her to a limited range of light work and substantial evidence support the decision.  (Mot. 8.)

### 1.   Legal Standard

Before making the step four determination, the ALJ first must determine the claimant's RFC.  20 C.F.R. § 416.920(e); Nowden, 2018 WL 1155971, at *2.  The RFC is "the most [one] can still do despite [her] limitations" and represents an assessment "based on all the relevant evidence."  20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1).   The RFC must consider all of the claimant's impairments, including those that are not severe.  20 C.F.R. §§ 416.920(e); 416.945(a)(2); Social Security Ruling ("SSR") 96-8p, available at 1996 WL 374184 (Jul. 2, 1996).[8]  The RFC is "based on all the relevant evidence in [the] case record."  20 C.F.R. § 416.945(a)(1).  "The ALJ must consider a claimant's physical and mental abilities, § 416.920(b) and (c), as well as the total limiting effects caused by medically determinable impairments and the claimant's subjective experiences of

---

[8] SSRs are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner.  20 C.F.R. § 402.35(b)(1).  While SSRs do not have the force of law, the Court gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989); see also Avenetti v. Barnhart, 456 F.3d 1122, 1124 (9th Cir. 2006).

pain, § 416.920(e)." Garrison, 759 F.3d at 1011. A determination of RFC is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion); 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." Vertigan, 260 F.3d at 1049.

At step four, the RFC is used to determine if a claimant can do past relevant work and at step five to determine if a claimant can adjust to other work. Garrison, 759 F.3d at 1011. "In order for the testimony of a VE to be considered reliable, the hypothetical posed must include 'all of the claimant's functional limitations, both physical and mental' supported by the record." Thomas, 278 F.3d at 956.

When applying for disability benefits, the claimant has the duty to prove that she is disabled. 42 U.S.C. § 423(c)(5)(A). The ALJ has an independent "duty to fully and fairly develop the record and to assure that the claimant's interests are considered." Widmark v. Barnhart, 454 F.3d 1063, 1068 (9th Cir. 2006) (quoting Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)). The ALJ has a duty to further develop the record where the evidence is ambiguous or the ALJ finds that the record is inadequate to allow for proper evaluation of the evidence. Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001); Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001). A specific finding of ambiguity or inadequacy in the record is not required to trigger the necessity to further develop the record where the record itself establishes the ambiguity or inadequacy. McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011).

## 2.   Mental Health Record

The ALJ considered that Plaintiff saw a psychiatrist in 2017-2018, for medication management. (AR 34.)

Plaintiff was seen on April 6, 2017; May 5, 2017; June 1, 2017; June 29, 2017; September 19, 2017; November 21, 2017; January 16, 2018; March 13, 2018; and April 10, 2018, for a follow-up appointment and reported that her treatment for insomnia was effective. (AR 1320, 1322, 1324, 1326, 1328, 1330, 1332, 1334, 1336.) She continued to endorse moderate depression and anxiety but reported that her level of energy had improved. (AR 1320, 1332.) On April 6, 2017; May 4,

2017; June 1, 2017, she reported some improvement in her mood and level of energy (AR 1332, 1334, 1336), and on June 29, 2017, she reported a significant improvement in her mood since the prior visit, and felt her medication was effective, (AR 1330).  On September 19, 2017, she reported since stopping her bupropion she felt her depression was worse and she was angrier and more irritable, but she felt her medication was effective.  (AR 1328.)  On examination at each visit, she had good eye contact, was appropriately dressed, speech had normal rate and rhythm, and psychomotor activity was normal.  (AR 1320, 1322, 1324, 1326, 1328, 1330, 1332, 1334, 1336.)  Her mood was depressed, and affect was broad with normal range and intensity.  (AR 1320, 1322, 1324, 1326, 1328, 1330, 1332, 1334, 1336.)    She was alert and oriented x3; thoughts were congruent, logical, and goal directed.  (AR 1320, 1322, 1324, 1326, 1328, 1330, 1332, 1334, 1336.)  She had no hallucinations, delusion, paranoia, or suicidal or homicidal ideation.  (AR 1320, 1322, 1324, 1326, 1328, 1330, 1332, 1334, 1336.)  Insight and judgment were fair.  (AR 1320, 1322, 1324, 1326, 1328, 1330, 1332, 1334, 1336.)  She was diagnosed with severe episode of recurrent major depressive disorder without psychotic features.  (AR 1320, 1322, 1324, 1326, 1328, 1330, 1332, 1334, 1336.)

The ALJ also considered that in 2019, Plaintiff continued medication management and in August she reported "relationship difficulties, stress, hallucinations, and suicidal ideation, as well as a relapse with alcohol, and her psychiatrist sent her to the emergency room.  (AR 34, 753-54.) Plaintiff was seen on August 9, 2019, reporting that her mother had moved away two weeks prior, her fiancé refused to have her car fixed so she cannot visit her children and he is extremely physically and verbally abusive, is manipulative and demanding, and provides no support whatsoever.  (AR 753.)  Plaintiff felt stuck in the relationship due to lack of finances and having no support in the area.  (AR 753.)  Plaintiff was tearful during the visit, stated she was doing terrible, and had a suicidal plan to drink antifreeze.  (AR 753.)  She stated she relapsed on alcohol over the last month after being sober for four years.  (AR 753.)  She was drinking ½ to 1 pint of fireball and around 4-6 beers (a total of 10 to 16 drinks) per day.  (AR 754.)  She also reported having command type auditory hallucinations that tell her she is worthless and other negative things and to cut herself and commit suicide.  (AR 754.)  Plaintiff was informed that she needed to go to the emergency

1  room because it was unsafe for her to go home.  (AR 754.)  The record also notes that prior to this

2  visit, Plaintiff's medication had been changed and she was doing better on the new medication.

3  (AR 755.)

4          On examination, Plaintiff was disheveled and she had psychomotor activity retardation.

5  (AR 754.)  Her speech was slowed, and mood was noted to be down, depressed, and tearful.  (AR

6  754.)  Affect was labile and congruent.  (AR 754.)  Thought processes were logical and goal

7  directed.  (AR 754.)  Thought content notes auditory hallucinations, preoccupation with violence,

8  command type auditory hallucinations to harm herself.  (AR 754.)  She was alert and oriented x4,

9  with grossly intact attention.  (AR 754.)  Recent and remote memory were judged to be adequate.

10 (AR 754.)  Insight and judgment were poor.  (AR 754.)  Language was within normal limits and

11 fund of knowledge was adequate.  (AR 754.)

12         The ALJ also considered that on August 9, 2019, Plaintiff was hospitalized for depression,

13 cutting, and suicidal ideation.  (AR 34, 451-55.) The hospital record notes that Plaintiff appeared

14 profoundly depressed, tearful, and anxious.  (AR 451.)  She endorsed auditory hallucinations and

15 reported she has been cutting herself and had a plan to commit suicide by drinking antifreeze.  (AR

16 451.)  Her judgment and insight were poor.  (AR 451.)  Plaintiff was restarted on her psychiatric

17 medication.  (AR 451.)  Plaintiff reported that she was occasionally using marijuana and was

18 currently drinking alcohol occasionally.  (AR 452.)  She improved over a period of several days

19 with a combination of medicines.  (AR 34, 452.)  She was diagnosed with bipolar disorder and

20 released to a safe living situation with her sister.  (AR 452-53.)

21         After discharge from the hospital, Plaintiff resumed with medication management and at a

22 follow up with her psychiatrist on October 7, 2019, she reported, "feeling pretty good today." (AR

23 34, 975, 1190.)  The record notes she has been feeling significantly better since the change in her

24 medication, with improvement in mood, anxiety, and irritability.  (AR 34, 975, 1190.)  On

25 examination, she was appropriately dressed and groomed.  (AR 34, 976, 1191.)  Behavior, motor

26 activity, and speech were normal.  (AR 34, 976, 1191.)  Mood was fair with a full affect.  (AR 34,

27 976, 1191.)  Thoughts were logical and goal directed, and thought content was non-psychotic.  (AR

28 34, 976, 1191.)  Plaintiff was alert and oriented x4.  (AR 34, 976, 1191.)  Attention was grossly

1   intact, and recent and remote memory were adequate.  (AR 34, 976, 1191.)  Insight and judgment

2   were good, language was within normal limits and fund of knowledge was adequate.  (AR 34, 976,

3   1191.)

4          Plaintiff returned to her psychiatrist on November 1, 2019, and reported feeling "really

5   depressed."  (AR 34, 969.)   However, her mental status evaluation was unchanged and showed fair

6   mood, full affect, normal behavior, normal speech, logical and goal directed thoughts processes,

7   normal thought content, adequate memory, intact concentration and attention, alert and oriented x4,

8   good insight and judgment, and adequate fund of knowledge and she was referred for therapy.[9]

9   (AR 34-5, 970.)

10         The ALJ also noted that on November 4, 2019, Plaintiff reported a suicide attempt by

11  drinking antifreeze ten days prior to her primary care physician but did not report this when she

12  saw her psychiatrist on November 1, 2019.  (AR 35, 1385.)  She reported she was not suicidal, and

13  she did not seek any additional treatment.  (AR 35, 1385.)

14         The ALJ noted that Plaintiff continued to seek mental health treatment in 2020.  (AR 35.)

15  On January 21, 2020, she began therapy and reported financial problems.  (AR 35, 1638.)  She saw

16  her psychiatrist on February 3, 2020, reporting she was doing pretty good, and examination findings

17  remain the same with no behavioral abnormalities or significant cognitive deficits noted.  (AR 35,

18  1632-33.)  She continued monthly sessions with her therapist in February and March reporting some

19  stress and depression but in March 2020, she reported she was improved and stable.  (AR 35, 1617,

20  1622, 1643, 1652.)  She followed-up with her psychiatrist March 30, 2020, reporting she was doing

21  okay.  (AR 35, 1613.)   Mental examination findings remained unchanged revealing a fair mood,

22  full affect, normal behavior, normal speech, logical and goal directed thoughts processes, normal

23  thought content, adequate memory, intact concentration and attention, alert and oriented x4, good

24  insight and judgment, and adequate fund of knowledge.  (AR 35, 1649.)

25         The ALJ noted that after March 2020, the record does not contain any mental health

26  treatment.  (AR 35.)

27  _____

28  [9] The ALJ also references a December 2019 visit with her psychiatrist, but this appears to be an error as the record
noted is a duplicate of the November 4, 2019, visit.

The ALJ considered that Plaintiff attended a consultative examination via telehealth with Mary K. McDonald, Ph.D. on February 23, 2021. (AR 35, 1680-86.) Plaintiff reported that she is still prescribed medication by her psychiatrist, and she was in counseling. (AR 35, 1681.) She appeared disheveled with poor grooming, angry and mildly dressed mood, and she had resistant, evasive, and dramatic behavior and variable affect. (AR 1680-81, 1683, 1684.) Plaintiff was oriented x3 with clear speech and average intelligence. (AR 35, 1683.) Plaintiff was uncooperative when asked about her memory, but Dr. McDonald noted that she had unimpaired memory when answering questions about her work history. (AR 35, 1680.) Her judgment and insight were excellent, and she had logical, clear, and well-organized thought processes. (AR 35, 35, 1684.) Plaintiff refused to cooperate to assess her concentration and attention. (AR 35, 1684.) There were no perceptual abnormalities or suicidal or homicidal ideation observed or reported. (AR 35, 1684.) Here mood was noted to be mildly depressed as well as angry and oppositional. (AR 1685.) Dr. McDonald diagnosed malingering of psychiatric and cognitive disorder, possibly also of medical disorder, and reported no impairments in functioning. (AR 35, 1685-84.)

Finally, the ALJ considered that on March 5, 2021, Plaintiff was hospitalized for worsening anxiety after drinking alcohol and reporting hallucinations. (AR 36, 1700.) Plaintiff reported that she had been told by her doctor that since she has been drinking it might contradict her current medication. (AR 1700.) She had been drinking a half a pint per day and her last drink had been the day prior. (AR 1721.) She recently got a DUI. (AR 1700.) She was started on a protocol for alcohol detoxication. (AR 1701.) During the stay, Plaintiff was noted to have some irritability, with poor insight. (AR 1702.) Her hospital course was basically lability of mood, irritability and anxiety which were managed with the titration of her medication and continuation of medication she was taking. (AR 1702.) It is noted that it was not clear whether she was taking her medication consistently prior to hospital stay. (AR 1702.) She was advised that she should not be mixing alcohol with the medication that she is taking. (AR 1724.) Plaintiff improved with treatment, she was able to perform activities of daily living without assistance, and she was ambulating without assistance upon discharge. (AR 35, 1703.)

///

3.      Discussion

Here, Plaintiff alleges that the ALJ erred by not getting another consultative opinion because the opinion of Dr. McDonald was erroneous, finding Plaintiff more limited than the non-examining agency physicians opined, and failing to further develop the record on her mental health treatment after she was hospitalized for suicidal ideations and hallucinations.

### a.      Plaintiff's mental RFC has substantial support in the medical record

As to Plaintiff's mental impairments, the ALJ noted that the record does establish a history of depression and anxiety, but she has received proper treatment and has reported improvement in her symptoms.  (AR 35.)  The ALJ also noted that her two hospitalizations for depression and suicidal ideation both involved alcohol usage and she improved with detoxification and medications.  (AR 34, 35, 36.)  The ALJ also considered that Plaintiff refused to cooperate with the consultative examination, and her mental status evaluations have consistently revealed a fair mood, full affect, normal behavior, normal speech, logical and goal directed thoughts processes, normal thought content, adequate memory, intact concentration and attention, alert and oriented x4, good insight and judgment, and adequate fund of knowledge.  (AR 36.)

i.      Opinion evidence

Plaintiff contends that the ALJ erred because the opinion of Dr. McDonald "who failed to actually opine any limitations on the basis of Plaintiff's mental conditions as she erroneously found Plaintiff only carried the diagnosis of malingering" did not reflect her current level of functioning and the opinion evidence did not consider the full record. (Mot. 9.)  In developing the mental RFC, the ALJ considered the opinions of the non-examining agency consultants and the consultative examination by Dr. McDonald.

Dr. Barsukov opined at the initial level that Plaintiff has a moderate limitation in understanding, remembering or applying information; but mild limitations in the areas of interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself.  (AR 36, 137-38.)  He also considered that Dr. Mogrovejo opined at the reconsideration level that Plaintiff has moderate limitations in the areas of understanding, remembering or applying information and concentrating, persisting or maintaining pace; and mild limitations in the areas of

1   interacting with others; and adapting or managing oneself.  (AR 36, 155-57.)  The ALJ found that

2   neither opinion was fully persuasive.  (AR 36.)

3       He found the opinion that she has no more than moderate limitations to be supported by her

4   complaints of difficulty concentrating.  (AR 36.)  However, he found there are no significant

5   cognitive deficits noted at appointments or on mental status evaluations.  (AR 36.)  Review of the

6   medical record cited by the ALJ provide substantial support for the finding.  As the ALJ noted,

7   despite her complaints of depression and anxiety, mental examination at her appointments with her

8   psychiatrist showed no deficits in her mental functioning.  (AR 970, 976, 1320, 1322, 1324, 1326,

9   1328, 1330, 1332, 1334, 1336.)  Further, review of the remainder of the medical record consistently

10  shows no deficits in her mental functioning but report that her mental status is normal and no

11  deficiencies in concentration or memory are noted.  (AR 761, 763, 767, 1369, 1392, 1422, 1428,

12  1429, 1484, 1500, 1534, 1569, 1606.)

13      The ALJ also noted that the moderate limitations were also consistent with her ability to pay

14  bills and handle finances.  (AR 36, 346, 365, 382.)

15      The ALJ found that the opinions of only a mild limitation in limitations in the areas of

16  interacting with others; and adapting or managing oneself were not found to be persuasive, as they

17  were not supported by or consistent with her impairments that include bipolar disorder and PTSD

18  and her lack of cooperation at the consultative examination.  (AR 36, 1680-86.)  Yet, the ALJ found

19  the conclusion that she has no more than a moderate limitation in these areas is supported by her

20  interaction at other appointments and mental status evaluations showing a fair mood and

21  cooperative behavior.  (AR 36, 761, 763, 767, 970, 976, 1392, 1429, 1632, 1649.)  The ALJ

22  additionally noted her ability to shop in stores and attend appointments without confrontations with

23  staff supported no more than a moderate limitation.  (AR 36.)

24      In considering the opinion of Dr. McDonald, the ALJ found it not to be fully persuasive.

25  (AR 36.)  He found Dr. McDonald's opinion of no functional impairment was based on the one-

26  time examination, and it is not fully supported by other evidence in the record.  (AR 36.)

27      Plaintiff argues that Dr. McDonald's February 23, 2021, opinion of her functioning was

28  erroneous as demonstrated by her admission with suicidal ideation on March 5, 2021.  (AR 36,

1700.)  The ALJ addressed Plaintiff's hospitalizations finding that both her hospitalizations occurred when Plaintiff had relapsed and was consuming alcohol.  (AR 34, 35.)  At her August 9, 2019, admission, Plaintiff admitted that she had relapsed after being sober for 4 years and was drinking 10 to 16 alcoholic drinks per day.  (AR 754.)  On March 15, 2021, Plaintiff admitted that she was drinking ½ a pint of alcohol a day.  (AR 1721.)  The record notes that she was advised that drinking alcohol could contradict her current medications and it was unclear if she was taking her medications consistently.  (AR 1700, 1724.)  She underwent detoxification, was treated with medications and, at both visits, she improved with treatment.  (AR 34, 35, 452, 1701, 1703.)

ii.    Development of the record

Plaintiff argues that the ALJ was required to further develop the record by obtaining additional records from her psychiatrist and obtaining a new consultative examination.  Here, the ALJ did not find that the record was inadequate to allow for proper evaluation of the evidence.  Mayes, 276 F.3d at 459-60; Tonapetyan, 242 F.3d at 1150.  The ALJ held a hearing on January 26, 2020, which was continued so more records could be obtained and so Plaintiff could get a consultative examination.  (AR 101.)  Additional records were received, and the consultative examination was held.  (AR 46.)  A continued hearing was held on June 29, 2021.  (AR 51.)  While a specific finding of ambiguity or inadequacy in the record is not required to trigger the necessity to further develop the record, McLeod, 640 F.3d at 885, here, the medical record contains over a thousand pages.  The ALJ properly considered the evidence as a whole and determined that Plaintiff's severe mental disability requiring hospitalization occurred with her abuse of alcohol and once treated the record consistently demonstrated no more than moderate limitations in Plaintiff's functioning.  As discussed above, substantial evidence supports the ALJ's findings.

Finally, Plaintiff argues that the ALJ interpreted raw findings and there is not substantial support for the limitations set in the RFC because no physician opined the limitations.    It is true that courts find that without a medical opinion to support the conclusion that Plaintiff was able to perform a specific type of work, the ALJ's RFC lacks the support of substantial evidence.  See de Gutierrez v. Saul, No. 1:19-CV-00463-BAM, 2020 WL 5701019, at *6 (E.D. Cal. Sept. 24, 2020); Miller v. Astrue, 695 F. Supp. 2d 1042, 1048 (C.D. Cal. 2010) (it is improper for an ALJ to act as

his own medical expert and substitute his medical opinion for the opinion of medical providers); Padilla v. Astrue, 541 F. Supp. 2d 1102, 1106 (C.D. Cal. 2008) ("as a lay person, an ALJ is 'simply not qualified to interpret raw medical data in functional terms.' ") (quoting Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir.1999)); Shipp v. Colvin, 2014 WL 4829035, at *7 (C.D. Cal. Sept. 26, 2014) ("Since. . .the record contains no assessment by a treating or examining doctor regarding the effect of plaintiff's physical impairments on her ability to function, it appears that the ALJ's physical residual functional capacity assessment was erroneously based solely on the ALJ's own, lay interpretation of plaintiff's testimony and other raw medical evidence in the record").

However, in this instance, the ALJ did not find that Plaintiff was capable of more functionality than the medical opinions provided, but he found that the mild limitations in the areas of interacting with others and adapting or managing herself opined by Drs. Barsukov and Mogrovejo were not consistent with her impairments of bipolar disorder and PTSD and her lack of cooperation at the consultative examination.  (AR 36.)   The ALJ found that a limitation in these areas was no more than moderate which was supported by her interactions at other appointments, mental status evaluations showing a fair mood and cooperative behavior, and her ability to shop in stores and attend appointments without confrontations with staff.  (AR 36.)   The ALJ properly weighed the medical evidence and his finding of moderate limitations in the areas of interacting with others and adapting or managing herself has substantial support in the record.

On this record, the Court finds the ALJ reasonably interpreted the objective medical evidence and substantial evidence supports the ALJ's relevant findings.  As previously noted, this Court must defer to the decision of the ALJ where evidence exists to support more than one rational interpretation.  Drouin v. Sullivan, 966 F.2d 1255, 1258 (9th Cir. 1992); see also Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999) (When the evidence presented could support either affirming or reversing the Commissioner's conclusions, the court cannot substitute its own judgment for that of the Commissioner).  "As [the Court] cannot say that the ALJ's interpretation of the available evidence was not rational, the ALJ's conclusions were supported by substantial evidence."  Shaibi v. Berryhill, 883 F.3d 1102, 1108 (9th Cir. 2017).  Accordingly, the Court concludes the ALJ's RFC findings are supported by substantial evidence in the record and

Plaintiff's motion for summary judgment shall be denied.

**V.**

**CONCLUSION AND ORDER**

In conclusion, the Court denies Plaintiff's Social Security appeal and finds no harmful error warranting remand of this action.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED.  It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Patrishia Marie Dittmer.  The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:   __**March 6, 2024**__

UNITED STATES MAGISTRATE JUDGE